# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-3076

_____

Tabatha Manning

*Plaintiff - Appellee*

v.

Vaughn Cotton, an Omaha Police Officer; Theodore Delezene, an Omaha Police Officer; City of Omaha Nebraska

*Defendants - Appellants*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: May 11, 2017
Filed: July 5, 2017

_____

Before RILEY, BEAM, and SHEPHERD, Circuit Judges.

_____

BEAM, Circuit Judge.

Tabatha Manning sued Vaughn Cotton and Theodore Delezene, both police officers for the City of Omaha ("Officers"), and the City of Omaha (collectively "Defendants") following her arrest for possession of methamphetamine. Manning filed a civil rights action against the Officers for violating her Fourth, Fifth, and Fourteenth Amendment rights, and against the City under a theory of municipal

liability. The district court[1] denied qualified immunity for the Officers and denied the City of Omaha's motion for summary judgment. For the reasons discussed below, we affirm the district court's denial of qualified immunity and dismiss the City's appeal for lack of jurisdiction.

## I.    BACKGROUND

Manning was driving to pick up her children from a house in Omaha, Nebraska, when the Officers stopped her for a broken taillight. Manning had attempted to cover the taillight with tape, but white light showed through. The broken taillight violated Nebraska Revised Statutes §§ 60-6,219(3) and (6)(b).[2] Manning disputes that her taillight was defective and that white light was showing. The Officers' police cruiser was equipped with a video camera that turns on when the lights are activated and records footage both outside and inside the police cruiser. Once stopped, the Officers approached Manning's vehicle and told her the reason they pulled her over. Manning then confessed that she did not have a driver's license or registration and that she had warrants out for her arrest. Officer Cotton confirmed with dispatch that there were two warrants out for her arrest. He then informed her that they would have to arrest her and take her to the Douglas County Correctional Center. Neither officer searched Manning, but they handcuffed her before placing her in the police cruiser. After she was handcuffed, Manning asked Officer Delezene to take her cell phone out of her left back pocket so that it would not break. He complied. Officer Cotton searched Manning's purse. Officer Delezene then helped

---

[1]The Honorable Joseph F. Bataillon, United States District Judge for the District of Nebraska.

[2]Section 60-6,219(3) requires that "[e]very motor vehicle and trailer . . . be equipped with one or more taillights, at the rear of the motor vehicle or trailer, exhibiting a red light visible from a distance of at least five hundred feet to the rear of such vehicle."

Manning into the passenger side of the backseat. As he did, his flashlight illuminated the backseat. Neither the Officers nor Manning saw anything in the backseat at that time.

During the ride, Manning was the only person in the backseat of the police cruiser. Once they arrived at the Correctional Center, the Officers exited the vehicle and according to the officers, placed their weapons in the trunk of the police cruiser. Manning disputes that the officers even went to the trunk. At this point, the video recording stopped. The government explains that it stopped recording at the time Officer Cotton turned the engine off, but Manning states that the video stopped because one of the officers turned it off. Officer Cotton entered the backseat from the driver side of the vehicle to unbuckle Manning's seatbelt. Officer Delezene opened the passenger side door to help Manning out of the police cruiser. After Manning exited the police cruiser, Officer Delezene noticed a small package on the door seal that appeared to be drugs. Testing later confirmed that it was methamphetamine. No one had ridden in the police cruiser before Manning, and at the beginning of their shift, Officer Cotton inspected the backseat of the police cruiser and found nothing. Manning denied the package was hers. Officer Delezene threatened to have her tested for drugs if she did not tell the truth about the package. Manning asked if she could take a drug test and if the package could be fingerprinted. Officer Cotton reviewed the camera footage from inside the police cruiser and determined that it was inconclusive. The Officers refused to administer a drug test or fingerprint the package.

The Officers arrested Manning for possession of methamphetamine, and she remained incarcerated for three days. She then brought a civil rights action against the Officers alleging that they violated her Fourth, Fifth, and Fourteenth Amendment rights by planting the methamphetamine, conspiring together against her, falsely implicating her in a felony, and falsely testifying against her. She also alleged that the City of Omaha proximately caused the Officers' unconstitutional conduct and

-3-

failed to adequately train the Officers. The Defendants filed a motion for summary judgment challenging the merits of the claims and claiming qualified immunity. The district court granted summary judgment on the conspiracy claim, holding that there was no evidence of a conspiracy, only "pure speculation." The district court denied the motion in all other respects. Holding that the Officers were not entitled to qualified immunity, the district court stated, "[I]f hypothetically speaking an officer illegally plants drugs on or around someone, there would be no qualified immunity. So, because of the claims of the plaintiff, the Court finds there is no qualified immunity based on these allegations." Denying the City of Omaha's motion for summary judgment on Manning's municipal liability claim, the district court held that although "evidence of a policy or custom is thin, . . . based on [a] previous incident and the alleged [inadequate] response by law enforcement, a jury could find there is an unwritten custom or practice of not thoroughly investigating such incidents."

Defendants now appeal, arguing that the district court (1) failed to make the required individualized analysis for qualified immunity; (2) erred in holding that Officer Cotton was not entitled to qualified immunity; (3) erred in holding that Officer Delezene was not entitled to qualified immunity; and (4) erred in denying the City of Omaha's motion for summary judgment.

## II.    DISCUSSION

### A.    Standard of Review

Although we generally lack jurisdiction to hear an immediate appeal from the district court's denial of summary judgment, we have "limited authority . . . to review the denial of qualified immunity through an interlocutory appeal under the collateral order doctrine." Shannon v. Koehler, 616 F.3d 855, 861 (8th Cir. 2010) (alteration in original) (quoting Langford v. Norris, 614 F.3d 445, 455 (8th Cir. 2010)). Under this doctrine, we may only "determine whether all of the conduct that the district court

'deemed sufficiently supported for purposes of summary judgment' violated the plaintiff's clearly established federal rights." Lockridge v. Bd. of Trs. of Univ. of Ark., 315 F.3d 1005, 1008 (8th Cir. 2003) (en banc) (quoting Behrens v. Pelletier, 516 U.S. 299, 313 (1996)). Thus, "we have jurisdiction to decide whether, accepting [Manning's] version of the facts, [the Officers are] entitled to qualified immunity as a matter of law." Shannon, 616 F.3d at 861.

We review the district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in favor of the nonmoving party. Bishop v. Glazier, 723 F.3d 957, 960-61 (8th Cir. 2013). A party is entitled to summary judgment only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "When a defendant asserts qualified immunity at the summary judgment stage, the plaintiff must produce evidence sufficient to create a genuine issue of fact regarding whether the defendant violated a clearly established right." Bishop, 723 F.3d at 961. In doing so, the plaintiff "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

## B. Qualified Immunity

Under the doctrine of qualified immunity, government officials are generally immune from civil liability so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). This doctrine gives "government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Blazek v. City of Iowa City, 761 F.3d 920, 922 (8th Cir. 2014) (quoting Stanton v.

Sims, 134 S. Ct. 3, 5 (2013)).  To determine whether a government official is entitled to qualified immunity, we must ask (1) whether the official's conduct violated a constitutional right; and (2) whether the violated right was clearly established. Borgman v. Kedley, 646 F.3d 518, 522 (8th Cir. 2011).  "The defendants are entitled to qualified immunity unless the answer to both of these questions is yes." McCaster v. Clausen, 684 F.3d 740, 746 (8th Cir. 2012).  A right is clearly established when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987). In other words, the right violated must have been established "beyond debate."  Hollingsworth v. City of St. Ann, 800 F.3d 985, 989 (8th Cir. 2015) (quoting City & Cty. of S.F., Cal. v. Sheehan, 135 S. Ct. 1765, 1774 (2015)).

### 1.    Individualized Analysis

The Officers argue that the district court failed to make the required individualized analysis in arriving at its determination and instead erroneously treated the Officers as one unified group.  We agree.  The doctrine of qualified immunity requires an individualized analysis as to each officer, Roberts v. City of Omaha, 723 F.3d 966, 974 (8th Cir. 2013), because a person "may be held personally liable for a constitutional violation only if his *own* conduct violated a clearly established constitutional right," Baribeau v. City of Minneapolis, 596 F.3d 465, 482 (8th Cir. 2010) (emphasis added).  Here, the district court's singular paragraph analyzing qualified immunity generally discusses both officers as "Defendants."  There was no analysis "of *each* officer's alleged conduct to determine whether the factual allegations against *each individual officer* were sufficient to overcome qualified immunity." Roberts, 723 F.3d at 974 (emphasis added).  Thus, the district court erred by failing to conduct individualized analyses as to each officer as required.  On appeal we conduct an individualized qualified immunity analysis for each officer, using the facts the district court used in its determination below and viewing the facts in the light most favorable to the nonmoving party.  See id.

-6-

## 2. Officer Cotton

The Defendants argue that an inspection of Officer Cotton's conduct shows there is no genuine issue of material fact and he is thus entitled to qualified immunity. We disagree. To determine whether Officer Cotton is entitled to qualified immunity, we must ask whether his actions violated a constitutional right and whether that right was clearly established. See Borgman, 646 F.3d at 522. If the answer to both of these questions is "yes," he is not entitled to qualified immunity. McCaster, 684 F.3d at 746. It is clearly established that "the Fourteenth Amendment's guarantee of due process is violated by 'the manufacture of . . . false evidence.'" Livers v. Schenck, 700 F.3d 340, 354 (8th Cir. 2012) (alteration in original) (quoting Moran v. Clarke, 296 F.3d 638, 647 (8th Cir. 2002) (en banc)). Thus, the only issue here is whether Officer Cotton's alleged actions violated Manning's constitutional rights.

Manning first contends that her rights were violated because neither officer had probable cause to pull her over. Because roadside traffic stops are more like Terry stops than custodial arrests, we apply the principles enumerated in Terry v. Ohio, 392 U.S. 1 (1968), which require that an officer making a stop have "reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). Here, there is evidence that Manning had a broken taillight, which violates Nebraska Revised Statutes §§ 60-6,219(3) and (6)(b). Because she was violating a law, Officer Cotton was justified in pulling her over, and he is entitled to qualified immunity for the traffic stop itself. Officer Cotton then approached Manning's vehicle. At that time, Manning informed Officer Cotton that she had no driver's license or registration and that she had warrants out for her arrest. Officer Cotton asked Manning to step out of her vehicle and wait in front of his police cruiser. Officer Cotton radioed dispatch and learned that Manning indeed had two misdemeanor warrants out for her arrest, which gave him probable cause to arrest her. Thus, Officer Cotton violated no constitutional right by arresting Manning and is likewise entitled to qualified immunity for the arrest.

The ultimate issue on appeal is Cotton's conduct once Manning was in the police cruiser. Prior to placing Manning in the police cruiser, Officer Cotton allowed her to return to her car, retrieve her cell phone, and make a call. He then got her purse out of her car and moved her car for her. Manning placed her phone in her left back pocket. While Officer Delezene was handcuffing Manning, Officer Cotton searched Manning's purse. Neither officer searched Manning because she was being compliant, they had no suspicions about her, and according to protocol they needed a female officer present to search a female arrestee. Officer Delezene placed Manning in the passenger side of the backseat. Once they arrived at the Correctional Center, Officer Cotton turned off the vehicle and allegedly placed his gun in the trunk of the police cruiser. Manning states that the video camera stopped only because the Officers turned it off. At this point in time, Manning was sitting in the police cruiser out of eyesight of either officer. Officer Cotton unbuckled Manning's seatbelt from the driver's side of the backseat. He first became aware of the drugs when Officer Delezene found the package on the ledge between the seat and the door and showed it to Officer Cotton. Officer Delezene questioned Manning and threatened to test her for drugs and fingerprint the package. Officer Cotton then reviewed the police cruiser video footage to see if Manning made movements consistent with retrieving the package from her person and attempting to dispose of it. He found the evidence inconclusive. After reviewing the video, Officer Cotton refused to conduct a drug test or fingerprint the package.

Manning speculates that Officer Cotton threw the package of drugs into the space near the passenger door when he unbuckled her seatbelt, but if Officer Cotton entered through the driver's side, he would have had to toss the package over or behind Manning. She would have nearly certainly seen this. Officer Cotton believes that Manning could have removed the package from her pocket and tossed it beside the door in an effort to conceal it. The video shows that Manning leaned forward toward the passenger door throughout the ride. Although it seems unlikely that Officer Cotton could have planted the drugs on the seal of the passenger side door

-8-

from the driver's side of the backseat, we must view the evidence in the light most favorable to the nonmoving party, Manning. Bishop, 723 F.3d at 960-61. Here, there is speculation on both sides and numerous conflicting facts that are material to the disposition of the case. A genuine issue of material fact exists as to how the package of methamphetamine came to be in the police cruiser and more specifically, whether Officer Cotton played any role in placing the methamphetamine in the cruiser. As such, the district court did not err in denying Officer Cotton qualified immunity.

### 3. Officer Delezene

As noted above, the constitutional rights in question were clearly established at the time of the violation. See Livers, 700 F.3d at 354. Officer Delezene agrees that the Officers stopped Manning because her broken taillight violated a Nebraska statute, and the warrants for her arrest gave them probable cause to arrest her. Officer Cotton conducted the stop and spoke to Manning while Officer Delezene stood by and observed. Thus, Officer Delezene is also entitled to qualified immunity for the traffic stop and arrest.

After deciding they had probable cause to arrest Manning, Officer Delezene handcuffed her and brought her to the rear passenger door. Manning then asked Officer Delezene to remove her phone from her left back pocket, which was away from the door. Officer Delezene complied. He helped her into the backseat of the police cruiser. Unlike Officer Cotton, Officer Delezene was near where the methamphetamine was later found. The video recording from inside the police cruiser shows Officer Delezene helping Manning into the backseat. His flashlight illuminated the area, revealing nothing in the backseat. However, the lower edges of the back passenger side door seal, where the drugs were later found, were not visible. The district court apparently assumed that because Officer Delezene took the phone out of Manning's left back pocket, there was nothing in Manning's right back pocket. However, as mentioned above, Officer Delezene did not search Manning because she

was being cooperative, they had no suspicions, and proper procedure required a female officer for the search. Thus, the record is unclear as to whether Manning had anything in her right back pocket.

According to the video and the parties' accounts, the drive to the Correctional Center was uneventful. When the Officers arrived, Officer Delezene allegedly placed his gun in the trunk of the police cruiser. During this time, Manning was unattended in the backseat of the police cruiser and out of the Officers' eyesight. Immediately after Officer Delezene opened the passenger side back door and got Manning out, he claims he saw the small, plastic bag on the ledge between the seat and the door. According to Officer Delezene, this area is accessible to a person inside the cruiser. Officer Delezene showed Officer Cotton the bag and asked Manning if it was hers. She denied possession. Officer Delezene then told Manning that DNA tests and fingerprinting could be done to prove that it was hers, but he claims that this was actually a bluff and that the decision to do such testing is left to the lab professionals. Officer Delezene testified that Officer Cotton searched the police cruiser at the beginning of the shift, and Officer Delezene did not see the package when he put Manning in the backseat during the arrest. Thus, he reached the only logical conclusion: Manning placed the methamphetamine in the cruiser. Officer Delezene viewed the video footage and like Officer Cotton, found it inconclusive.

Officer Delezene is not entitled to qualified immunity because Manning's allegations are based on disputed material facts. "Summary judgment is not appropriate where . . . a dispute remains regarding facts material to the qualified immunity issue." Rohrbough v. Hall, 586 F.3d 582, 587 (8th Cir. 2009). The crux of this case is how the package of methamphetamine ended up in the police cruiser, which is material to the qualified immunity issue. As the district court stated, if Officer Delezene planted the methamphetamine, he is not entitled to qualified immunity. However, a jury must resolve this factual dispute and make the necessary credibility determinations. See Coker v. Ark. State Police, 734 F.3d 838, 843 (8th

-10-

Cir. 2013). Thus, summary judgment was not appropriate, and the district court did not err in denying Officer Delezene qualified immunity.

### C.    The City of Omaha

The City argues that the district court erred in denying summary judgment on Manning's municipal liability claim.  It further argues that we have pendent jurisdiction to review this claim because it is "inextricably intertwined" with the Officers' qualified immunity claims.  We disagree.  "An issue is 'inextricably intertwined' with properly presented issues only 'when the appellate resolution of the collateral appeal necessarily resolves the pendent claims as well.'" Shannon, 616 F.3d at 866 (quoting Lockridge, 315 F.3d at 1012).  The alleged pendent claim must be "coterminous with, or subsumed in, the claim before the court on interlocutory appeal."  Id. (quoting Kincade v. City of Blue Springs, 64 F.3d 389, 394 (8th Cir. 1995)).  Deciding to uphold the district court's denial of qualified immunity for the Officers does not resolve whether the City is entitled to summary judgment on the municipal liability claims.  Moreover, this circuit has explicitly held that the question of whether a city "is liable under 42 U.S.C. § 1983 for failing to train its police force is *not* 'coterminous with, or subsumed in'" the question of whether a city's officers are entitled to qualified immunity because "resolution of these two issues requires entirely different analyses." Veneklase v. City of Fargo, 78 F.3d 1264, 1270 (8th Cir. 1996) (emphasis added) (first clause quoting Kincade, 64 F.3d at 394); see also Woolfolk v. Smith, 81 F.3d 741, 743 (8th Cir. 1996).  Thus, we lack jurisdiction to hear the City's appeal.

## III.   CONCLUSION

We affirm the district court's denial of qualified immunity and dismiss the City's appeal for lack of jurisdiction.

_____

-11-